**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MARY RIORDAN,** | **1:04-CV-6568 OWW DLB** |
| **Plaintiff,** | |
| | **MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 16)** |
| **v.** | |
| **FEDERAL EXPRESS CORPORATION, and DOES I TO XX,** | |
| **Defendants.** | |

**I.   INTRODUCTION**

This matter comes before the court on Defendant's Federal Express Corporation ("Defendant" or "FedEx") motion for summary judgment pursuant to Federal Rules of Civil Procedure 56 to adjudicate Plaintiff's Mary Riordan ("Plaintiff" or "Riordan") three employment termination-related claims alleging: (1) violation of California Government Code § 12940 et seq. ("Fair Employment and Housing Act" or "FEHA") based on physical disability, (2) breach of the employment contract between Riordan and FedEx, and (3) breach of the covenant of good faith and fair dealing.  Defendant seeks summary judgment for all three claims

1

on the grounds that: (1) Plaintiff cannot establish she was qualified to perform the courier job, an element of prima facie discrimination claim under FEHA, nor establish FedEx failed to provide reasonable accommodations (Count I), and (2) Plaintiff was an at-will employee and cannot argue that she was terminated without just cause in breach of her employment contract (Count II), and in breach of the covenant of good faith and fair dealing (Count III).  Oral argument was heard on June 26, 2006.

## II.   PROCEDURAL HISTORY

The complaint was filed November 17, 2004.  Doc. 1, Complaint.  Defendant moved for summary judgment on January 13, 2006.  Doc. 16, Motion.  Plaintiff filed her opposition on May 25, 2006.  Doc. 30, Opposition.  Defendant replied on May 30, 2006.  Doc. 31, Reply.  Defendant filed an amended memorandum in support of summary judgment on May 31, 2006.  Doc. 36, Am. Mem. in Supp.  Defendant filed a second amended memorandum in support of summary judgment on June 1, 2006.  Doc. 37, Am. Mem. 2d in Supp. ("SAM").

## III.   BACKGROUND

### A.   Employment Agreement

On June 8, 1983, shortly before commencing employment with FedEx, Plaintiff signed an Employment Agreement contained in her Employment Application.  Doc. 31, Def.'s Reply to Pl.'s Opp. to

Def.'s Statement of Undisp. Facts in Supp. of Mot. for Summ. J.

[hereinafter, "ROSUF"; *undisputed unless otherwise noted*], ROSUF

#2.   The application states:

> That should I be given employment either in the
> position applied for or any other, now or
> hereafter, <u>such employment shall be for an
> indefinite period</u> and <u>may be terminated at any
> time</u> without notice or liability for wages or
> salary. . .

Riordan Depo., Ex. 13(emphasis added).   The employment

application also states:

> [A]ll terms and conditions of my employment,
> except to the extent covered specifically by this
> contract or any other valid contract between
> [FedEx] and me (or someone legally acting on my
> behalf) shall be determined and governed by
> [FedEx]'s Policies and Procedures Manual . . .

*Id.*

### 1.   <u>People Manual and Employee Handbook</u>

FedEx's "Policies and Procedures Manual" is now referred to

as the "People Manual."   ROSUF #3.   The policies contained in the

People Manual are summarized in the FedEx Employee Handbook.

ROSUF #4.   Accompanying each summarized policy in the Employee

Handbook is a citation to the place in the People Manual where

the policy in its entirety can be found.   *Id.*   The policies in

the People Manual are modified periodically.   Accordingly, the

Employee Handbook is also modified periodically to reflect the

modifications in the People Manual.   ROSUF #5.   Each time the

Employee Handbook is modified, it is distributed to all FedEx

employees.   ROSUF #6.   Employees then sign a Record of Receipt

confirming that they received and reviewed the amended Employee

Handbook.   *Id.*

      On <u>May 18, 1994</u>, following her receipt of an amended

Employee Handbook, Plaintiff signed a Record of Receipt that

stated, in pertinent part:

> [FedEx] wants you to understand that *The Federal
> Express Employee Handbook* <u>should not be considered
> a contract of employment</u>, nor should *The Federal
> Express Employee Handbook's* provisions be read or
> implied to provide for one.   <u>Your specific rights
> as an employee are governed by the Employment
> Agreement you signed in your employment
> application</u>.

ROSUF #7 (emphasis added).   The May 18, 1994 Record of Receipt

also contained a verification just above Plaintiff's signature,

stating in pertinent part:

> I understand [] *The Federal Express Employee
> Handbook* contains guidelines only and [] the
> Company can modify this publication by amending or
> terminating any policy, procedure, or employee
> benefit program at any time . . . I further
> understand [] <u>no manager or representative of the
> Company, other than the CEO or a senior vice
> president designated by the CEO, has any authority</u>
> to enter into any agreement modifying this
> publication in any way, or <u>to enter into an
> agreement of employment with me for any specified
> period of time</u>.   Any amendment or agreement, if
> made, shall not be enforceable unless it is in
> writing and signed by me and the CEO or designated
> senior vice president.

4

ROSUF #8 (emphasis added).

Following additional amendments to the Employee Handbook, Plaintiff signed a Record of Receipt on <u>October 17, 1996</u>, and a Record of Receipt on <u>March 22, 2002</u>, both of which contained language virtually identical to the language contained in the May 18, 1994 Record of Receipt.  ROSUF #9.  The 1996 and 2002 Records of Receipt contained a verification beside Plaintiff's signature that was virtually identical to the verification in the 1994 Record of Receipt.  ROSUF #10.  The 1996 and 2002 Records of Receipt stated immediately above Plaintiff's signature: "I have read and fully understand the statement on this page[.]"  *Id.*

The People Manual in effect at the time Plaintiff's employment ended contained the following language under the "Purpose" section:

> This manual is intended <u>solely as a guide</u> for management and employees during employment.  It is not a contract of employment, and no such contract may be implied from its provisions.  <u>Nothing in this manual shall be construed to abrogate the employment agreement</u> signed upon application for employment preserving [FedEx]'s and the employee's right to <u>terminate this relationship at the will of either party</u>.

ROSUF #11 (emphasis added).

### B.   Plaintiff's Employment History and Responsibilities

Plaintiff's 20-year employment with FedEx began on June 22, 1983 as a part-time customer service agent ("CSA") in Sacramento.

"ROSUF" #1.  Plaintiff left her CSA position in Sacramento to become a courier in Fresno on February 13, 1995.  ROSUF #14.

Plaintiff was a "swing" courier during her first nine to twelve months in Fresno, working many different routes.  ROSUF #18.  After working as a swing courier, Plaintiff was assigned to a regular route off Blackstone Avenue which she worked for approximately three years.  ROSUF #19.

Couriers are expected to meet stops-per-hour goals set by FedEx.  Couriers' performance review scores are based heavily on whether they meet their stops-per-hour goals.  Meeting the goal results in a score of 4 on a scale of 1 to 7, which is a "satisfactory" rating.  To achieve a score of 5, 6, or 7, a courier has to exceed his/her stops-per-hour goal.  ROSUF #21.  A courier's merit pay increase is based on his/her performance review score.  ROSUF #22.

The vast majority of Blackstone Route stops were to deliver packages to, or to pick up packages from, commercial, not residential, customers.  The Blackstone Route had very few residential stops.  ROSUF #23.  There are usually more failed deliveries on residential routes than commercial routes.  ROSUF #61.

After three years on the Blackstone Route, Plaintiff was awarded Route One somewhere around late 1998 to mid-1999.  ROSUF

#27.   Plaintiff bid on Route One because she was interested in buying a house within Route One's territory and Route One was close to the school her children attended.   ROSUF #28.   Seventy-five to eighty percent of the Route One stops were residential.   ROSUF #30.   Route One averaged about 75 stops a day for deliveries, but sometimes had as many as 120 stops a day for deliveries during the busiest times of the year.   Route One had more stops than the Blackstone Route.   ROSUF #31.   It was not unusual for a courier to drop off multiple packages at a single stop.   Plaintiff sometimes had to deliver approximately 130 packages in a single shift on Route One.   ROSUF #32.   Plaintiff continued working Route One until her employment with FedEx ended.   ROSUF #34.   Plaintiff's shift on Route One began at 7:00 a.m. and ended at about 5:15 p.m.   Each shift she would take off thirty minutes to an hour for lunch and she would take two fifteen-minute breaks.   ROSUF #35.

Plaintiff spent more than an hour-and-a-half each morning loading her truck and three other trucks.   This task involved removing hundreds of packages from a conveyor belt and placing them in the delivery trucks.   ROSUF #36.   Plaintiff worked continuously during this loading process; there were no breaks. *Id.*   The belt was located on an elevated surface.   ROSUF #37. Plaintiff alleges and Defendant disputes that because the

7

conveyer belt was at waist level, Plaintiff was not required to squat and lift packages from the ground to load the trucks. Doc. 27, Pl's Statement of Undisp. Facts in Opp. To Mot. For Summ. J. [hereinafter "PSUF"; *undisputed unless otherwise noted*] #12. Plaintiff alleges and Defendant disputes that at the Clovis station, it was not necessary to lift any packages from the ground.  PSUF #16.  Defendant alleges Plaintiff would have to step up six inches each time she entered the back of a truck during the loading process and step down six inches each time she exited the back of a truck during the loading process.  ROSUF #40.  Plaintiff alleges that the bumper of the truck was four to six inches below the level of the truck bed.  *Id.*

It is undisputed that the courier job description does not state that running, jumping, squatting, kneeling, crouching, crawling, pivoting, climbing, or walking over uneven ground is a physical requirement of a courier's job duties.  PSUF #43

Plaintiff claims and Defendant disputes that she never ran, jumped, kneeled, climbed, crouched or crawled while performing her duties as a courier. PSUF #17.  It is undisputed that if Plaintiff encountered a package that was too heavy to "lift," she would ask for assistance or ease and slide the package to the ground using the bumper of the truck, then deliver the package on a dolly or hand truck.  PSUF #18.  It is undisputed that the time

**8**

Plaintiff spent managing heavy packages was very small in relation to the time spent performing her other courier job duties.  PSUF #20.  Plaintiff alleges that she avoided uneven ground when delivering by walking on customers' sidewalks and driveways.  PSUF #21.

Plaintiff would leave the building by 9:00 a.m. each morning to begin making her deliveries.  She needed to deliver the priority overnight packages by 12:00 p.m. and the standard overnight packages by 4:30 p.m.  ROSUF #45.  As was the case with all couriers, Plaintiff drove her route alone.  ROSUF #46.  When Plaintiff's employment with FedEx ended, her stops-per-hour goal was 12 to 13 stops per hour.  ROSUF #47.  The stops-per-hour goal had been increased three or four times during the period Plaintiff worked Route One.  *Id.*  Each increase made the goal more difficult to meet.  *Id.*  Sometimes Plaintiff could not meet the stops-per-hour goal.  ROSUF #48.  Meeting the goal was difficult.  *Id.*  Plaintiff almost always felt rushed.  She always felt hurried.  *Id.*  Throughout her shift, Plaintiff always walked very quickly.  *Id.*

The number, size, shape, and weight of packages varied from day to day, sometimes drastically.  ROSUF #49.  Also, the location of Plaintiff's stops varied a lot from one day to the next.  *Id.*  It was impossible for Plaintiff to anticipate where

**9**

her stops were going to be on a particular day. *Id.* This was especially true with regard to residential routes, such as Route One. *Id.* On any given day Plaintiff could be sent to any residence within the boundaries of Route One to either deliver or pick up a package. *Id.*

When making deliveries, Plaintiff usually exited and then re-entered her truck from the passenger door. ROSUF #50. This required her to negotiate two separate steps on the side of her truck below the floor of the cab. *Id.* She would take three steps up from the ground each time she entered the cab from the passenger door and three steps down to the ground each time she exited the cab from the passenger door. *Id.* Some of the houses on Plaintiff's route had steps leading to the front door that Plaintiff would have to negotiate when delivering or picking up packages. ROSUF #56. Sometimes Plaintiff had to step up and down a curb when making a stop. ROSUF #57. Sometimes Plaintiff would exit and enter her truck from the rear entrance. ROSUF #53. This would require Plaintiff to take one large step from the bumper to the ground or from the ground to the bumper, because the bed of the truck was about waist high and the bumper was only about six inches below the bed of the truck. *Id.* When exiting or entering the truck this way, Plaintiff would use hand rails mounted on each side of the rear opening. *Id.* Some stops

required Plaintiff to make more than one round trip to and from the truck.  ROSUF #55.  Sometimes Plaintiff made up to four round trips to and from her truck in connection with a single stop. *Id.*

In addition to making her deliveries, Plaintiff would pick up packages from about ten locations each day on average.  ROSUF #54.  The size, shape, and weight of the packages could vary drastically from day to day; their pick-up locations could also vary drastically.  *Id.*  Plaintiff would sometimes have to pick up more than one package per location.  *Id.*

After returning to the station in the evening, Plaintiff would unload the packages she picked up onto the belt.  ROSUF #59.  She would then place any packages she was unable to deliver into a cage where such packages were stored until an attempt at redelivery could be made.  *Id.*  This required Plaintiff to unload the undelivered packages from her truck and walk them into the cage where they were placed on the ground or on shelves inside the cage.  *Id.*

C.   Plaintiff's Injury and Removal from Route One Courier Position - November 2001 thru April 2002

On November 23, 2001, Plaintiff injured her left ankle while loading a truck.  ROSUF #62.  Plaintiff was treated for this injury at Concentra Medical Centers ("Concentra") and was

11

diagnosed with a "sprain of the left ankle fibulo-calcaneal ligament and small avulsion fracture of the talus."  ROSUF #63. Pursuant to FedEx policy, Plaintiff was promptly placed in a temporary position falling within her temporary restrictions and remained there until March 29, 2002.  ROSUF #70.  She was then returned to Route One on April 1, 2002, after her treating physician, Dr. Mikel R. Meyer, released her to return to full-duty work without any restrictions.  PSUF #28.

### 1.  Continued Complications From Ankle Injury

Plaintiff returned to regular-duty work on Route One on April 1, 2002, but her ankle did not tolerate the job as it did before her injury.  ROSUF #71.  Prior to her injury, Plaintiff's ankle was completely pain-free.  *Id.*  Immediately after her return to work on April 1, 2002, Plaintiff's ankle became continuously painful, finally forcing her to tell her manager, Don Slagle, in June or July 2002, that she needed to return to the doctor.  *Id.*  Plaintiff testified in her deposition, "Every day I was in pain.  I would wake up in pain."  Plaintiff testified that the pain would persist throughout her shift each day.  She explained, "I could wake up in the morning with it hurting and I had been sleeping all night[.]"  ROSUF #72.  When asked if there was a particular activity that aggravated her pain, Plaintiff replied, "anything could aggravate it; sleeping,

walking, anything."  ROSUF #73.   In describing what prompted her to approach Mr. Slagle in June or July of 2002, Plaintiff stated, "One morning . . . I came in to do my route, and in the middle of doing my sort, I just – 'I can't – I can't go on today with this ankle pain.'  I was in pain everyday . . . [T]his day, even after taking an Aleve, it wasn't subsiding.  So I went to Don, I said, 'I really think there is something wrong, and that I need to go back to a doctor.'"  ROSUF #75.

### 2.   Authorizations to Return to Work: June thru October 2002

On **June 26, 2002**, Dr. Ken Nagamoto authorized Plaintiff to return to work without restrictions.  Doc. 31-2, Pl.'s Resp. to SUF #76 (*citing* Decl. of Daniel Kopfman [hereinafter, "Kopfman Decl."], Exs. K, L), PSUF #32.  On **June 27, 2002**, Dr. R. Edgar Vera authorized Plaintiff to return to work without restrictions. *Id.* (*citing* Kopfman Decl., Exs. M, N).  On **July 3, 2002**, Dr. Nagamoto again authorized Plaintiff to return to work without restrictions.  *Id.* (*citing* Kopfman Decl., Ex. O).  In Plaintiff's workers' compensation case, Plaintiff obtained authorizations to return to work without restriction on **September 9, 2002**, and **October 14, 2002**.  *Id.* (*citing* Kopfman Decl., Exs. P, Q), PSUF

#33.[1]

          3.   Dr. Branscum's Evaluation, Orthopedic specialist:
               October 29, 2002

     Plaintiff was evaluated by Dr. John L. Branscum, an

Orthopedic specialist at Concentra, on October 29, 2002.  ROSUF

#76.  In his November 26, 2002 Report, Dr. Branscum noted:

          At the time of her injury, Ms. Riordan was a
          delivery driver for FedEx . . . She had to hurry
          to do her job and many times she hit the ground
          running.  If she did not hurry she would have
          difficulty finishing her route . . . She complains
          of pain in the anterolateral aspect of the ankle
          with walking, going up and down steps and carrying
          heavy objects.

ROSUF #77 (*citing* Kopfman Decl, Ex. R, Branscum's Report).  Dr.

Branscum assessed the following restrictions under the heading

"Work Restrictions":

          Based upon the findings on today's history and
          physical examination, this patient has a
          disability to the left ankle precluding running,
          jumping, squatting, kneeling, heavy lifting,
          climbing, walking over uneven ground, crouching,
          crawling, pivoting and other activities requiring
          comparable effort.

ROSUF #78 (*citing* Kopfman Decl., Ex. R).  However, Dr. Branscum

_____

     [1] Defendant objects to Plaintiff's response to SUF #76 in
that the exhibits on which the reply is predicated are
inadmissible because not properly authenticated.  *Id.*, Def.'s
Reply to Pl.'s Resp. to SUF #76.  "In any event, these records
confirm that Dr. Branscum was the only specialist who evaluated
Plaintiff after she was released to return to courier work on
March 29, 2002 and prior to December 30, 2002.  Dr. Meyer is not
even an MD."  *Id.*

also states: "[Plaintiff] is now back working at Federal Express doing her regular job . . . This patient has returned to her usual and customary occupation."  Doc. 31, Def.'s Resp. to Pl.'s Concise Statement of Disp. Facts [hereinafter, "RCSDF"] #39 (*citing* Kopfman Decl., Ex. R).

       **4.   Plaintiff's Second Medical Leave: December 2002**

     Defendant received Dr. Branscum's report on or about December 27, 2002.  RCSDF #38.  Defendant immediately removed Plaintiff from her courier position, believing the work restrictions were permanent and concluding the "permanent" restrictions with which Plaintiff was assessed by Dr. Branscum prevented Plaintiff from performing the essential functions of a courier.  Doc. 37, SAM, 9.  Plaintiff disputes that the report concludes that the restrictions prevent Plaintiff from performing the essential job duties and that the conclusions render Plaintiff incapable of performing her job, citing the statements in the report that Plaintiff is back at her regular job and returned to her usual and customary occupation.  *Id.*

     Defendant removed Plaintiff from the courier position on December 30, 2002.  ROSUF #84.  Plaintiff's left ankle was still hurting her when she was removed from Route One.  *Id.*  As soon as Plaintiff was removed from her position, she told FedEx that she wanted to be returned to the Route One courier position.  RCSDF

#50.

     Plaintiff was placed on a second medical leave.  ROSUF ##86,

87.  The Route One courier position, now considered by Defendant

to be vacant, was put up for bid on or about January 7, 2003.

RCSDF #76.  The position was awarded to another employee on

January 15, 2003.  ROSUF #93.

          D.   **Defendant's Attempts to Reassign Plaintiff after**
               **Defendant Removed Plaintiff from the Route One Courier**
               **Position**

     Harry Saurer was FedEx's Human Capital Program Manager when

Plaintiff was removed from the Route One courier position and

placed on medical leave for the second time.  RCSDF #57.  During

Plaintiff's second medical leave, Plaintiff and Mr. Saurer spoke

on the telephone approximately fifteen times.  ROSUF #96 (*citing*

Riordan Depo. 175:18-176:1).  These telephone conversations

occurred throughout Plaintiff's medical leave.  *Id.*  Mr. Saurer

offered Plaintiff positions in other cities, including at least

one full-time CSA position in Sacramento.  ROSUF #98 (citing

Riordan Depo. 191:16-23).[2]  Plaintiff was unwilling to relocate

_____

     [2] "You know, Harry's trying to offer me positions in other
cities.  I said that I'm not willing to move and relocate, you
know.  I have a family that's established here now.  It's just
unfeasible at this time.  And even in stating that to Harry, he
called me and offered me a position back in Sacramento at the
call center.  I told him -- I said, 'Harry, I can't take that.
I'm not relocating.'  A week later I received a call from a
manager at the Sacramento call center for a phone interview for

out of the Fresno area, and declined positions that required her to do so.  ROSUF #99.  Plaintiff told Mr. Saurer she expected to be returned to the Route One courier position.  ROSUF #100.

In or about early March 2003, an opening developed, the physical requirements of which did not include activities which Dr. Branscum's report indicated Plaintiff could not perform.  ROSUF #101.  Mr. Saurer offered the position to Plaintiff in writing on March 6, 2003.  *Id.*  The opening was for a full-time Service Assurance Agent position, an extremely light-duty desk job.  ROSUF #102.  The opening was at the Fresno airport, which was only about a fifteen-minute drive from Plaintiff's house.  ROSUF #103.  Plaintiff was not entitled to top-out pay as a Service Assurance Agent (*i.e.*, the hourly rate at the highest end of the relevant pay range), but instead was offered top-out pay of $17.82 per hour, less than the $19.62 per hour, the top-out rate for couriers, she earned as a courier on Route One.  *Id.*

Plaintiff declined the offer of employment in the Service Assurance Agent position.  ROSUF #104 (*citing* Riordan Depo. 177:3-6).  During her deposition, when asked, "Can you explain why you turned down this particular offer?" Plaintiff replied:

---

the position.  I told Harry, 'Don't even set me up for it.  I'm not relocating.  This is a waste of time.'"  Riordan Depo. 191:16-23.

17

> Yes.  From the very beginning, all I asked for was what was taken away from me back; my job, my route, that job that I was doing up to the termination on the 30th of December.  This [the Service Assurance Agent position] wasn't what I asked for.  This wasn't what I wanted.  This — there was no reason for me not to be able to go back to doing my normal job.

*Id.* (*quoting* Riordan Depo. 177:13-20).  From December 30, 2002 until Plaintiff's employment with FedEx ended, Plaintiff repeatedly made it clear to Mr. Saurer that being reassigned to Route One was the only thing that would satisfy her.  ROSUF #105.

### 1.   Dr. Lewis Evaluation - March 2003 - No Further Work Preclusions

Plaintiff was evaluated by Dr. Charles O'Lewis on March 12, 2003.  ROSUF ##106, 107.  His March 13, 2003, report specifically found Plaintiff had no work preclusions.  ROSUF #107.  Mr. Saurer, of FedEx received Dr. O'Lewis's findings on or about March 13, 2003, and on the same date offered Plaintiff the opportunity to return to work on Monday, March 17, 2003, as a full-time courier on the Blackstone Route, the same route she had previously worked for approximately three years.  ROSUF #108.

Plaintiff informed Mr. Saurer that for personal reasons she might not be able to accept Mr. Saurer's offer of a full-time position.  ROSUF #109.  She explained during her deposition that her youngest child, who was eleven when Plaintiff was offered the Blackstone Route, was released from school early on Mondays.  *Id.*

Instead of being dismissed from school at 2:45 p.m., he was released at 1:45 p.m. on Mondays and would then walk home, arriving at Plaintiff's house at 2:00 p.m.  *Id.*  Because Plaintiff's home was in Route One's territory, she could take her lunch break at 2:00 p.m. at her house, which allowed her to let her youngest child in the house.  *Id.*  She would then finish her lunch break at 3:00 p.m., which is when her two oldest children would arrive home.  *Id.*  Plaintiff testified that the only full-time route that would allow her to be home with her youngest child between 2:00 p.m. and 3:00 p.m. on Mondays was Route One. Therefore, due to her child care issue, Plaintiff told Mr. Saurer that she might need a part-time courier route.  ROSUF #110.

In response to Plaintiff's request, on March 14, 2003, Mr. Saurer sent Plaintiff a written offer providing her with the following options:

> (1) she could accept the initial offer of a full-time courier position [Blackstone route] with a starting date of Monday, March 17, 2003;
> (2) she could accept a part-time courier position with a starting date of March 17, 2003;
> (3) she could use the balance of her 90-day medical leave to find another position she was qualified to do; or
> (4) she could voluntarily resign her employment.

ROSUF #111.  Those were her only four options and she was given until March 17, 2003, to decide which one to select.  *Id.* Plaintiff testified that she may have received the written offer

19

of March 14, 2003 on that date, or she could have received it on Saturday, March 15, 2003, or Monday, March 17, 2003.  In any event, however, she testified that on Friday, March 14, 2003, she understood that the part-time courier position was an option.  ROSUF #112.  Both courier positions offered to Plaintiff provided her with the same hourly rate she received on Route One and were handled out of the same station as Route One.  The full-time route provided Plaintiff with the same 7:00 a.m. to 5:15 p.m. shift as Route One.  ROSUF #113.

On the morning of Monday, March 17, 2003, Plaintiff arrived at the FAT-A station and selected the offer of the part-time position.  ROSUF #114.  She marked that selection on her letter of March 14, 2003 and then signed and dated the letter whereupon it was faxed to Mr. Saurer.  *Id.*

However, Defendant contends that Plaintiff was upset on March 17, 2003 and sent her home.  ROSUF #115  Plaintiff denies she was upset on March 17, 2003 and explained in her deposition that it was FedEx's decision to send her home on that day.  Doc. 32, Exhibit R, Kopfman Decl., Riordan Depo. 214:14-24.  Plaintiff explained during her deposition that on that date the only thing she was "interested in in terms of future employment at FedEx was getting Route One back."  ROSUF #115.  Plaintiff's senior manager, Howard Morgan, instructed Plaintiff to go home.  ROSUF

#116.  Plaintiff returned to work the next day, March 18, 2003,
and admits she was very emotional.  She was still upset that she
had not been allowed to return to Route One.  As explained by
Plaintiff during her deposition, "I was basically coerced into
having to make a decision I didn't want to make, choosing an
option that I didn't want to choose, taking a position that I
didn't want. . . .  The only option I wanted was to get back
exactly what was taken from me [*i.e.*, the Route One courier
position]."  ROSUF #117.

         **2.   Plaintiff's Last Day of Employment with FedEx**

     Plaintiff refused to drive her part-time route on the
morning of March 18, 2003.  ROSUF #119.  She told Mr. Slagle, "I
don't think I can do this today.  I don't think I can emotionally
be out there today."  *Id.*  Mr. Morgan and Mr. Slagle repeatedly
told Plaintiff she had accepted the offer of the part-time
position and so she needed to drive the route or her failure to
do so would be treated as a voluntary resignation.  Plaintiff
elected not to drive the route.  ROSUF #120 (citing Riordan Depo.
227:8-228:3).  Plaintiff testified in her deposition that she
responded to Mr. Morgan and Mr. Slagle telling her she had better
drive the route or it would be considered a voluntary resignation
on her part, with the statement that she is opting to take the
rest of her 90-day leave.  Doc. 32, Exhibit R, Kopfman Decl.,

                                21

Riordan Depo. 224:5-13.   Defendant FedEx contends that was no longer an option.   ROSUF #121.   Plaintiff admitted no one told her after she accepted the part-time position that taking the balance of her 90-day leave was still an option.   *Id.*   Defendant treated Plaintiff's action as a voluntary resignation.   ROSUF #122.

## IV.   LEGAL STANDARD

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."   Fed.R.Civ.P. 56(c); *Cal. v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998).   Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.   *Id.*   A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.   *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).   Facts are "material" if they "might affect the outcome of the suit under the governing law."   *Campbell,* 138 F.3d at 782 (*quoting Anderson,* 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrell,* 477 U.S. 317, 322-23 (1986).

The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1996). Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255. A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial. *See Abdul-Jabbar v. G.M. Corp.,* 85 F.3d 407, 410 (9th Cir. 1996).

23

### V.   ANALYSIS

The Complaint asserts three causes of action:

(1) FEHA claim for employment discrimination and failure to provide reasonable accommodation in violation of the California Fair Employment and Housing Act, Cal. Gov. Code §§ 12940, *et seq.* Doc. 1, Complaint, ¶ 11.  (2) Plaintiff's employment was terminable only for good cause, not at will, and Defendant terminated Plaintiff without good cause on December 30, 2002 <u>and</u> March 18, 2003.  *Id.*, ¶¶ 20, 24.  (3) Plaintiff also alleges Defendant's termination of Plaintiff's employment violated the covenant of good faith and fair dealing.

A.   <u>FEHA Claims (First Cause of Action)</u>

1.   <u>FEHA § 12940(a): Employment Discrimination</u>

Plaintiff alleges that she suffered adverse employment actions, termination, due to disability, in violation of FEHA. To establish a prima facie case of employment discrimination based upon disability, Plaintiff must demonstrate that she (1) suffers from a disability; (2) is an employee or an applicant within the meaning of FEHA, and (3) was subject to an adverse employment action because of the disability.  *Begatti v. Dep't of Rehab.*, 97 Cal. App. 4th 344, 360, 118 Cal. Rptr. 2d 443 (2002). The plaintiff employee in a section 12940 action bears "the burden of proving he or she was able to do the job, with or

24

without reasonable accommodation," a "qualified individual."
*Green v. State of California*, 42 Cal.4th 254, 262 (2007)
("qualified individual" means despite physical disability,
plaintiff is able to perform the essential duties of her
employment with or without reasonable accommodation).  Section
12940(a) of FEHA  prohibits employer discrimination based on an
employee's physical disability.  It is unlawful "[f]or an
employer, because of the ... physical disability, mental
disability, medical condition ... of any person, ... to bar or to
discharge the person from employment or from a training program
leading to employment, or to discriminate against the person in
compensation or in terms, conditions, or privileges of
employment."  Cal.Gov.Code § 12940(a).

FEHA's prohibition on terminating an employee because of
disability contains a defense: "This part does not prohibit an
employer from refusing to hire or discharging an employee with a
physical or mental disability ... where the employee, because of
his or her physical or mental disability, is unable to perform
his or her essential duties even with reasonable accommodations,
or cannot perform those duties in a manner that would not
endanger his or her health or safety or the health or safety of
others even with reasonable accommodations."  Cal.Gov.Code §
12940(a)(1).

FedEx argues that Plaintiff cannot establish the <u>she could perform the essential duties of the job with or without reasonable accommodations</u> during the time of her permanent disability because she was unable, either with or without reasonable accommodation, to perform the "essential functions" of the Route One courier position when she was removed from the position on December 30, 2002.  Doc. 37, SAM, 14.  To receive protection under FEHA for disability or perceived disability discrimination, a plaintiff must demonstrate that she is a "qualified individual" under FEHA.  Qualified individuals are: persons who are able, with or without reasonable accommodation, to perform the essential functions of the position.  *Green*, 42 Cal.4th at 267.

Plaintiff disputes that she could not perform the essential functions of the courier position and disputes Defendant's assertions of the essential functions of the courier position.

California Government Code Section 12926(f) defines "essential functions" as:

> (f) . . . the fundamental job duties of the employment position the individual with a disability holds or desires.  "Essential functions" <u>does not include the marginal functions of the position.</u>
> (1) A job function may be considered essential for any of several reasons...
>     (A) The function may be essential because <u>the reason the position exists is to perform that</u>

26

<u>function</u>.
(B) The function may be essential because of
the <u>limited number of employees available</u>
among whom the performance of that job
function <u>can be distributed</u>.

(2) Evidence of whether a particular function is
essential includes...
(A) The <u>employer's judgment</u> as to which
functions are essential.
(B) <u>Written job descriptions</u> prepared before
advertising or interviewing applicants for the
job.
(C) The amount of <u>time spent</u> on the job
<u>performing the function</u>.
(D) The consequences of not requiring the
incumbent to perform the function

Cal. Gov. Code § 12926(f) (emphasis added).

FedEx's courier job description has a section titled

"Essential Duties/Responsibilities."  Doc. 16, Saurer Decl., Ex.

C, FedEx Courier Job Description.  Some of the items under this

section state:

1. PROVIDES EFFICIENT AND SAFE DELIVERY AND PICK-UP OF
PACKAGES AND DOCUMENTS, WHILE REPRESENTING THE COMPANY
IN A PROFESSIONAL MANNER.
---
11. LOADS AND UNLOADS AIRCRAFT, CONTAINERS AND COMPANY
VEHICLES; OPERATES MECHANIZED RAMP EQUIPMENT TO LOAD
AND UNLOAD PACKAGES.

*Id.* at p. FEX(RB) 00020.  .

On page two of the FedEx Courier Job Description, under the

section titled "Knowledge, Skills and Abilities Required" it

states:

ABILITY TO LIFT 75 LBS.  ABILITY TO MANUEVER PACKAGES

27

OF ANY WEIGHT ABOVE 75 LBS WITH APPROPRIATE EQUIPMENT
AND/OR ASSISTANCE FROM ANOTHER PERSON.

*Id.* at p. FEX(RB) 00021.

It also states under the title "Special Notes":

THE INCUMBENT IS EXPECTED TO PERFORM ALL OTHER RELATED
DUTIES AS ASSIGNED.  EMPLOYEES CLASSIFIED IN THIS
POSITION MUST PERFORM COURIER ACTIVITIES ON A REGULAR
AND RECURRING BASIS, A MAJORITY OF TOTAL TIME WORKED.

*Id.*

Defendant alleges Plaintiff could not perform the essential

functions of the courier position, with or without reasonable

accommodation, because:

- **Immediately following Plaintiff's return to work
  on April 1, 2002, her ankle became continuously
  painful, which led to Plaintiff returning to
  doctor in June or July of 2002.  ROSUF #71
  (admitted).  Plaintiff testified she was in pain
  everyday and anything could aggravate it:
  sleeping, walking, included  ROSUF ##72-73**

- **Dr. John L. Branscum, an Orthopedic specialist at
  Concentra, November 2002 report stating (ROSUF
  ##76-78):**
  **Based upon the findings on today's history
  and physical examination, this patient has a
  disability to the left ankle precluding
  running, jumping, <u>squatting</u>, kneeling, <u>heavy
  lifting</u>, <u>climbing</u>, <u>walking over uneven
  ground</u>, crouching, crawling, <u>pivoting</u> and
  <u>other activities requiring comparable effort</u>.**

Defendant alleges the sheer physical demands of the Route

One courier position – the practical requirements of delivering

packages of drastically varying size and weight to both

28

residential and commercial clients at a relentless pace in

unpredictable environments – clearly exceeded Plaintiff's

capabilities as assessed by Dr. Branscum.  Doc. 37, SAM, 13ff.

- **Plaintiff was on her feet continuously for over an hour-and-a-half each morning** <u>loading hundreds of packages</u> **into trucks, during which** <u>she had to step up to enter the truck and down to exit</u>**.  ROSUF ##36-40 (admitted).**
- **Plaintiff made an average of 85 stops per day, including pick-ups, once she left the station.  ROSUF ##31 (admitted), 54 (admitted).**
- **Some stops required Plaintiff to make as many as four round trips to and from her truck.  ROSUF #55 (admitted).**
- <u>**Plaintiff had to climb into and out of her truck at each stop**</u>**, requiring her to** <u>use a set of steps</u> **affixed to the side of the truck.  ROSUF ##50 (admitted), 53 (admitted).  Plaintiff also had to negotiate steps leading to homes on her route, and step onto and off of curbs.  ROSUF ##56 (admitted), 57 (admitted) directly conflicting with the preclusion, assessed by Dr. Branscum, of Plaintiff "climbing."**
- <u>**Plaintiff sometimes encountered uneven surfaces on her route**</u>**, and** <u>sprained her ankle on uneven concrete on three separate occasions</u> **while working her route directly conflicting with the preclusion, of Dr. Branscum, of Plaintiff "walking over uneven ground."  ROSUF #81 (admitted)**
- **Plaintiff always walked very quickly throughout her shift and had to work very quickly to meet her stops-per-hour goal and always felt rushed.  ROSUF #48 (admitted).**
- **Dr. Branscum's report more generally precluded "other activities requiring" effort "comparable" to the specific preclusions, and that no reasonable doubt can exist that Plaintiff's courier position required such effort.  ROSUF #78 (admitted).**

Defendant argues that the permanent restrictions assessed

by Dr. Branscum are, by themselves, sufficient to establish as a matter of law that Plaintiff is unable to perform all the essential functions of the courier job.  Doc. 37, SAM, 16. Defendant's cited cases do not support this proposition.  In *Finegan v. County of Los Angeles*, 91 Cal.App.4th 1, 109 Cal.Rptr.2d 762 (2001), the California Court of Appeals reviewed a special verdict by a jury, in which the jury reviewed after-acquired medical evidence – undisputed medical opinion that plaintiff was not physically qualified to perform essential job functions.  The jury held that plaintiff was unable to perform his duties as a psychiatric nurse.  On appeal, the court upheld the use of the after-acquired medical evidence.[3]

Defendant also provides a declaration from Harry Saurer, Human Capital Management Program ("HCMP") manager at FedEx. Doc. 16-9, Saurer Decl., ¶ 1.[4]

---

[3] The other cited case by Defendant likewise does not support a finding for summary judgment: *Quinn v. City of Los Angeles*, 84 Cal.App.4th 472, 100 Cal.Rptr.2d 914 (2000), held there was no discharge based on a disability.  Plaintiff had failed an initial screening examination – sound localization test – a basis to deny an applicant a job.  He was however hired in error, and was terminated when the error was discovered, thus there was no discharge based on disability.  *Id.* at 482.  For this reason, the court held that FEHA did not apply.  *Id.* at 480. Here, Defendant concedes it removed Plaintiff as a courier on Route One because of her disability.  Doc. 37, SAM, 3.

[4] Mr. Saurer has held this position since 1996.  *Id.*  On of Mr. Saurer's job functions as a local HCMP manager is to help

An injured work at FedEx, who cannot perform his/her job duties due to temporary physical restrictions is placed on medical leave for up to 365 days.  *Id.* at ¶ 4.  While on medical leave the injured worker reports to a local HCMP manager.  *Id.* If the temporary restrictions exceed the initial 90-day period, the injured worker's former job may be filled by another worker. *Id.* at ¶ 6.  He states that he received, on or about December 22, 2002, "permanent work restrictions assessed to Ms. Riordan by Dr. John L. Branscum in his report of October 29, 2002."  *Id.* at ¶ 8.  He further states that he contacted corporate HCMP committee and they agreed that Ms. Riordan's restrictions could not be accommodated in a courier position, and thereafter, Mr. Saurer removed Plaintiff from her courier job on or about December 22, 2002.  *Id.* at ¶ 21.

However, it is undisputed that the courier job description

---

employees successfully transition from medical leave to positions falling within medical restrictions.  *Id.* at ¶ 3.  Mr. Saurer states that HCMP stands for the Human Capital Management Program at FedEx, a management team that functions, in part, through local committees and a corporate committee comprised of various representatives from different departments.  *Id.* at ¶ 3.  The HCMP managers, such as Mr. Saurer, are a conduit between disabled employees and the corporate HCMP committee located out of state in Memphis, TN, to assist FedEx in the process of evaluating requests for reasonable accommodations and engaging in an interactive process with disabled employees in an effort to identify whether reasonable accommodations exist.  *Id.* at ¶ 4.

31

does not state that running, jumping, squatting, kneeling, crouching, crawling, pivoting, climbing, or walking over uneven ground is a physical requirement of a courier's job duties. PSUF #43  Defendant claims however that Plaintiff cannot perform the essential functions of delivery and picking up packages, which involves loading, unloading company vehicles, without "running, jumping, squatting, kneeling, heavy lifting, climbing, walking over uneven ground, crawling, pivoting and other activities requiring comparable effort. *See* Doc. 31, Def's Reply to Pl.'s Statement of Undisp. Facts in Opp. to Mot. for Summ. J., #43.  Plaintiff claims that no one at FedEx told her that those were "essential functions" of the courier job.  PSUF #44.  But Defendant replies that Plaintiff knew they were essential functions based on her own personal experience working as a courier.  *See* Doc. 31, Def's Reply to Pl.'s Statement of Undisp. Facts in Opp. to Mot. for Summ. J., #44.

Plaintiff cites her own testimony that she could perform the job; her work authorizations she received from several doctors and workers compensation; and the short turnaround time between FedEx deeming her to have a permanent disability and Dr. O'Lewis, three months later, stating that she did not have a permanent disability.  Plaintiff also disputes that Dr. Branscum's report upon which FedEx relied upon to make its

assessment that Plaintiff was permanently disabled and unable to perform the essential functions of the courier job, concludes that Plaintiff is permanently disabled.  The report was additionally silent on any reasonable accommodations that could be made to permit Plaintiff to perform her courier duties.

Plaintiff argues that Dr. Branscum did not, unequivocally state Plaintiff was unable to perform the essential functions of her courier position.  Kopfman Decl., Ex. R, 10/29/02 report of Dr. Branscum.  In fact, Dr. Branscum stated: "[Plaintiff] is now back working at Federal Express doing her regular job. . . . This patient has returned to her usual and customary occupation."  RCSDF #39 (admitted).  Plaintiff asserts that this provides evidence that Dr. Branscum admits Plaintiff could perform her essential functions of the courier job.   It is undisputed Plaintiff was employed in the Route One courier position between April 1, 2002, and December 30, 2002, which was after she ended her first medical leave.  The record does not reflect how successfully Plaintiff discharged her courier duties prior to termination of employment because Defendant did not formally evaluate her performance during the latter part of her employment, April 1, 2002, and December 30, 2002.  *See* ROSUF #32 (Def.'s reply to Pl.'s resp.) ("Plaintiff . . . did not receive a performance review after she returned to work on April 1,

33

2002").  It is undisputed Plaintiff was assessed with no work restrictions by Dr. O'Lewis on March 12, 2003, less than three months after Dr. Branscum made his report.  ROSUF ##106-107 (admitted).  Plaintiff claims that she never ran, jumped, kneeled, climbed, crouched or crawled while performing her duties as a courier.  PSUF #17.

It is undisputed that if Plaintiff encountered a package that was too heavy to "lift," she would ask for assistance or ease and slide the package to the ground using the bumper of the truck, then deliver the package on a dolly or hand truck.  PSUF #18.  It is undisputed that the time Plaintiff spent managing heavy packages was very small in relation to the time spent performing her other courier job duties.  PSUF #20.  Plaintiff alleges that she avoided uneven ground when delivering by walking on customers' sidewalks and driveways.  PSUF #21 Plaintiff alleges and Defendant disputes that because the conveyer belt was at waist level, Plaintiff was not required to squat and lift packages from the ground to load the trucks.  PSUF #12.  Plaintiff alleges and Defendant disputes that at the Clovis station, it was not necessary to lift any packages from the ground.  PSUF #16.

Plaintiff also points to evidence of work authorizations she received after her injury to support her argument that she

could perform the essential functions of the job with or without reasonable accommodations: (1) March 29, 2002 Dr. Meyer released Plaintiff to return to regular job without restrictions.  PSUF #28.  (2) June 26, 2002, Dr. Nagamoto authorization to return to work.  PSUF #32.  (3) June 27, 2002, Dr. Vera work authorization to return to work.  PSUF #32  (4) July 3, 2002, Dr. Nagamoto. PSUF #32  (4) September 9, 2002 and October 14, 2002, under Plaintiff's workers compensation, authorization to return to work without restrictions.  PSUF #33.

There is a genuine issue of material fact that precludes granting summary judgment on Plaintiff's FEHA employment disability discrimination claim.  Plaintiff has raised a question of material fact regarding whether she could perform essential duties of the job with or without reasonable accommodation because a reasonable jury could conclude Plaintiff was able to perform the essential functions of her Route One courier position with or without reasonable accommodation.

Defendant's motion for summary judgment regarding Plaintiff's first cause of action for FEHA employment discrimination on the basis of a physical disability is DENIED.

2.   FEHA § 12940(m): Reasonable Accommodation

Defendant moves for summary judgment on Plaintiff's FEHA failure to provide reasonable accommodation claim, claiming that

35

FedEx provided reasonable accommodation to Plaintiff.  According to FEHA, "[i]t shall be an unlawful employment practice, unless based on a bona fide occupational qualification . . . :(m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  Cal. Govt. Code § 12940(m).

A "reasonable accommodation" includes "[j]ob restructuring, part-time or modified work schedules, reasssignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  *Id.* § 12926(n)(2); Cal.Code Regs. tit. 2, § 7293.9(a)(2)(2006). Subdivision (m) contains an "undue hardship" qualifier for employers limiting the employer's obligations to provide reasonable accommodations: "Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer ... to produce undue hardship to its operation."  *Id.* § 12940(m)(2)(a).

In order for FedEx to prevail on a motion for summary judgment on Plaintiff's FEHA failure to provide reasonable

36

accommodation claim, FedEx must prove with undisputed facts that it "did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Jensen v. Wells Fargo Bank*, 85 Cal.App. 4th 245, 263, 102 Cal.Rptr.2d 55 (2000).  Or in the alternative, FedEx must prove "there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation," *Id., or* reasonable accommodation was offered and refused.  *King v. United Parcel Service, Inc.*, 152 Cal.App.4th 426, 443, 60 Cal.Rptr.3d 359 (2007).  Generally, "the reasonableness of an accommodation is an issue for the jury." *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 954, 62 Cal.Rptr.2d 142 (1997).

Defendant argues in its summary judgment motion that it made reasonable accommodations available to Plaintiff.  It offered Plaintiff several jobs, including a full time CSA position in Sacramento that could be performed without exceeding Plaintiff's permanent medical restrictions.  It offered a desk job only fifteen minutes from her home for a Service Assurance Agent at the Fresno airport.  *See* ROSUF ##98, 99, 101-103. Defendant offered Plaintiff these jobs in March 2003, after

37

receiving the clearance from Dr. O'Lewis.  It argues that
Plaintiff was offered "top out" pay in the Service Assurance
desk job position, even though she was not eligible for it, to
bring her hourly rate to a level nearly equivalent to the "top
out" pay she received as a courier.  *See* ROSUF ## 97-99, 100.
Plaintiff declined the position.  Defendant argues that
Plaintiff's claim that Defendant failed to reasonably
accommodate Plaintiff's disability, fails "as a matter of law."
and consequently, FedEx met its obligation to reasonably
accommodate.  Doc. 37, SAM, 17  Defendant also argues that while
the Complaint does not include a claim of failure to engage in
good-faith interactive process, it is abundantly clear that they
did in an effort to identify reasonable accommodation for
Plaintiff.[5]

---

[5] Under FEHA, Plaintiff could also bring a claim for failure
to engage in good faith, in the interactive process with a
disabled employee.  Plaintiff did not bring such a claim.  Under
FEHA, an employer must engage in a good faith interactive process
with the disabled employee to explore the alternatives to
accommodate the disability.  Cal. Gov.Code § 12940(n); *Claudio v.
Regents of the University of California*, 134 Cal.App.4th 224,
242, 35 Cal.Rptr.3d 837 (2005) (an employer may not fail to
engage in a timely, good faith interactive process to determine
effective reasonable accommodations).  "An employee may file a
civil action based on the employer's failure to engage in the
interactive process."  *Claudio*, 134 Cal.App.4th at 243.  Failure
to engage in this process is a separate FEHA violation
independent from an employer's failure to provide a reasonable
disability accommodation, which is also a FEHA violation. Cal.
Gov. Code § 12940(m); *Gelfo v. Lockheed Martin Corp.*, 140

An employer's failure to provide reasonable accommodation is a violation of the statute even in the absence of an adverse employment action. *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 256, 102 Cal.Rptr.2d 55 (2000). But an employer is only required to make a "reasonable accommodation," it is not required "to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks." *Raine v. City of Burbank*, 135 Cal.App.4th 1215, 1222, 37 Cal.Rptr.3d 899 (2006); *Hanson v. Lucky Stores*, Inc., 74 Cal.App.4th 215, 228, 87 Cal.Rptr.2d 487 (1999). "The law and its regulations make clear that the term 'reasonable accommodation' is to be interpreted flexibly." *Sargent v. Litton Systems, Inc.*, 841 F.Supp. 956, 961 (1994). It has also been held that "[h]olding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future." *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 263, 102 Cal.Rptr.2d 55 (2000).

Defendant FedEx argues it reasonably concluded from Dr. Branscum's medical report that Plaintiff had a permanent

Cal.App.4th 34, 61, 43 Cal.Rptr.3d 874 (2006); *Claudio*, 134 Cal.App.4th at 242.

condition, and therefore they reasonably concluded that she could not perform the "essential functions" of the job which they considered included "climbing", "heavy lifting", "walking over uneven ground", "pivoting" and "other activities requiring comparable effort."

Defendant FedEx provides a declarations from Harry Saurer, Human Capital Management Program ("HCMP") manager at FedEx, as evidence of the inability of Defendant FedEx to reasonably accommodate Plaintiff in the courier position and as evidence of undue hardship to provide any further accommodation.  Doc. 16-9, Saurer Decl., ¶ 1.  Mr. Saurer states that "it would be unduly burdensome and an operational nightmare due, in part, to the fact that couriers run their routes alone." *Id.* at ¶ 16.  He states that a manager could not insure that a courier could not walk on uneven surfaces since it would have to visually inspect all locations where that day's packages were to be delivered. *Id.* There is no guarantee of the type and weight of packages to be delivered on a given day. *Id.* at ¶ 18.  "Repetitive squatting and kneeling are essential functions of a courier position that cannot be eliminated or modified." *Id.* at ¶ 19.

Defendant FedEx also provides a declaration from Mr. Morgan, the senior manager of the FAT-A station at the time, to

**40**

evidence reasonable accommodation was provided and undue hardship for any further accommodations.   Mr. Morgan stated similarly in his declaration that Ms. Riordan could not perform her duties as a courier without exceeding the permanent work restrictions assessed by Dr. Branscum because size, shape and weight of packages at FedEx varied daily, the delivery stops varied daily, and FedEx could never insure that a courier will not have to walk on uneven surfaces.   Doc. 16-8, Morgan Decl., ¶¶ 18, 20.   "Neither Ms. Riordan's courier position nor any other courier position could be modified to accommodate Ms. Riordan's permanent work restrictions ... FedEx could never insure that a courier will not have to walk on uneven surfaces..." *Id.* at ¶ 20.

Plaintiff argues first that she did not have a permanent disability and FedEx wrongly concluded from Dr. Branscum's report that she was permanently disabled in December 2002. Plaintiff argues she was able to do the courier job at the end of December 2002 but that Defendant restricted her from the job, thereby not reasonably providing her accommodation for a job that she was able to do and had been cleared to do by other physicians and the workers compensation division.   Defendant did not provide reasonable accommodations in December 2002 when they wrongly placed her permanent disability and when she returned

41

from disability leave in March 2003.

An employer may claim there were no available reasonable accommodations but if it did not engage in a good faith interactive process, 'it cannot be known whether an alternative job would have been found.'" *Wysinger v. Automobile Club of Southern California*, 157 Cal.App.4th 413, 424-25, 69 Cal.Rptr.3d 1 (2007), *quoting Claudio v. Regents of the University of California*, 134 Cal.App.4th 224, 245, 35 Cal.Rptr.3d 837 (2005). "The interactive process determines which accommodations are required. [citation]  Indeed, the interactive process could reveal solutions that neither party envisioned."  *Id.* at 425 (quotations and citations omitted).

Defendant's argument does not address what actions, if any, Defendant undertook to reasonably accommodate Plaintiff *in* her Route One courier position, *before* Defendant removed her because they presumed Plaintiff had a permanent disability.  It cannot be determined if Defendant offered Plaintiff reasonable accommodation in March 2003, unless it is undisputed that Plaintiff was to be placed on permanent disability in December 2002 and she was unable to perform her courier job as FedEx contends.  Plaintiff argues that Defendant has not provided any evidence that it conversed with Plaintiff and did not consider any accommodation that would enable her to remain in her Route

42

One courier position in December 2002.

Plaintiff raises a genuine issue of material fact as to whether FedEx reasonably concluded from Dr. Branscum's report that Plaintiff was permanently disabled.  Dr. Branscum's report stated that Plaintiff had returned to her position in his report.  RCSDF #39.  Plaintiff had been previously cleared shortly before Dr. Branscum's report for work without restrictions.  PSUF ##32-33.  Shortly after Dr. Branscum's report, Dr. O'Lewis cleared Plaintiff for work without restrictions.  ROSUF #107.  Plaintiff provided testimony that there was no reason for her not to be able to go back to doing her normal Route One job.  ROSUF #104.

There is a genuine issue of material fact regarding whether Defendant reasonably accommodated Plaintiff in the Route One courier position before removing her from the courier position in December 2002, including whether Defendant reasonably concluded Plaintiff was permanently disabled in December 2002. It is premature to address the issue of whether Defendant provided reasonable accommodation in March 2003 when Plaintiff was no longer considered permanently disabled.

Defendant's motion for summary judgment regarding Plaintiff's first cause of action for FEHA failure to provide reasonable accommodation is DENIED.

**3.   Punitive Damages**

Plaintiff seeks punitive damages on her FEHA claim. Defendant claims that Plaintiff's claim for punitive damages fails as a matter of law, because FedEx reasonably relied upon the alleged permanent medical restrictions imposed by Dr. Branscum to determine that Plaintiff was not able to perform the essential functions of her job.  Plaintiff argues there is a material question of fact as to whether Defendant's corporate policy of refusing to provide any accommodation to couriers who are disabled or perceived as disabled, including Plaintiff, is so oppressive, despicable or malicious as to support the Plaintiff's claim for punitive damages.

Where an action is pleaded under FEHA for employment discrimination, recovery of punitive damage under Cal. Civ. Code § 3294 is permitted if it is proven by clear and convincing evidence that defendant is guilty of oppression, fraud or malice.  Cal. Civ. Code § 3294(a); *Commodore Home Systems, Inc. v. Superior Court*, 32 Cal.3d 211, 220-221, 185 Cal.Rptr. 270 (1982); *Monge v. Superior Court*, 176 Cal.App.3d 503, 509, 222 Cal.Rptr. 64 (1986); *Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128, 1148-49, 74 Cal.Rptr.2d 510 (1998)(managing agents of big law firm were fully aware of partner's proclivities to harass female employees, and acted oppressively in their own right by

**44**

not taking "misconduct seriously.")

 "[S]ection 3294 applies generally to all noncontractual causes of action and the act does not suggest any legislative intent to preclude such damages to civil litigants." *Monge*, 176 Cal.App.3d at 509.  Cal. Civ. Code § 3294 allows punitive damages to be based upon a finding of "malice", "oppression," or "fraud."  Plaintiff claims Defendant FedEx's alleged corporate policy of refusing to provide any accommodation to couriers who are disabled or perceived to be disabled is oppressive, malicious or despicable.  Malice is defined as either "despicable" conduct done with a willful and conscious disregard for the rights or safety or others, or conduct which is actually intended to cause harm.  Cal. Civ. Code § 3294(c)(1). Despicable "is a powerful term that refers to circumstances that are 'base,' 'vile,' or contemptible'" *College Hospital, Inc. v. Superior Court,* 8 Cal.4th 704, 725, 34 Cal.Rptr.2d 898 (1994). Oppression is defined as conduct that subjects the person to cruel and unjust hardship in conscious disregard of that person's rights.  Cal. Civ. Code § 3294 (c)(2).  The evidence to support punitive damages must be so clear as to leave no substantial doubt, sufficiently strong to command the unhesitating assent of every reasonable mind.  *Mathieu v. Norrel Corp.,* 115 Cal.App.4th 1174, 1190, 10 Cal.Rptr.3d 52 (2004) (an

45

employer's failure to have a written policy specifically forbidding sexual harassment or discrimination does not itself show "oppression, fraud or malice" to create punitive damages liability), *citing Mock v. Mich. Millers Mut. Ins. Co.*, 4 Cal.App.4th 306, 333, 5 Cal.Rptr.2d 594 (1992).

Plaintiff contends that Defendant FedEx is statutorily liable for punitive damages because its employees, Mr. Saurer, Mr. Morgan, and Mr. Slagle, were guilty of oppression, fraud or malice and FedEx was itself guilty of oppression, fraud or malice.  An employer may be statutorily liable for punitive damages in action arising from tortious conduct of employee in three situations:

> (1) when <u>an employee</u> was guilty of oppression, fraud or malice, and the <u>employer with advance knowledge of the unfitness of the employee employed him</u> or her with a <u>conscious disregard</u> of the rights or safety of others;
>
> (2) when <u>an employee</u> was guilty of oppression, fraud or malice, and the <u>employer authorized or ratified the wrongful conduct</u>; or
>
> (3) when the <u>employer was itself guilty</u> of the oppression, fraud or malice.

*Weeks*, 63 Cal.App.4th at 1151 (emphasis added).

Section 3294 permits punitive damages against a corporate employer if the employee is sufficiently high in the corporation's decision-making hierarchy to be an "officer, director or managing agent." Civ.Code, § 3294(a),(b); *White v.*

46

*Ultramar, Inc.,* 21 Cal.4th 563, 572, 981 P.2d 944 (1999); *see also Cruz v. HomeBase*, 83 Cal.App.4th 160, 167, 99 Cal.Rptr.2d 435 (2000) ('Managing agents' are employees who exercise substantial discretionary authority over decisions that ultimately determine corporate policy).  Plaintiff has failed to present any substantial evidence to permit the jury to find a corporate decision-maker was involved in the alleged FedEx "corporate policy not to accommodate."  Plaintiff claims that the policy in question was implemented through its corporate managers, Mr. Saurer, Mr. Morgan, and Mr. Slagle.  Plaintiff asserted that Mr. Morgan had the ability to hire and fire employees but did not provide any evidence on his ability to exercise substantial discretional authority.  PSUF #56. Plaintiff did not provide evidence of any employee's broad discretionary power nor ability to exercise substantial discretional authority.  *See White*, 21 Cal.4th at 573.[6]

---

[6]  **In amending Cal. Civ. Code § 3294(b) the Legislature intended that principal liability for punitive damages not depend on supervisory employees' managerial level, *but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy*. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation can be managing agents.  Conversely, *supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees*. White,** 21 Cal.4th at 576-77.

Plaintiff also argues FedEx's corporate policy of discriminating against all of its employees with physical limitations is carried out by its managers according to corporate policy in knowing and conscious disregard of the rights of employees with disabilities.  Plaintiff contends that FedEx admits that its corporate policy and practice is to not accommodate any physical limitations in the courier position. Plaintiff also claims that there is evidence that when an employee is given restrictions or limitations by his or her doctors that are contrary to the physical requirements of the courier position, it is FedEx's policy to preclude employees from performing the courier job.

Defendant responds that although Howard Morgan, Plaintiff's senior manager, testified at his deposition that FedEx does not accommodate employees, *see* Morgan Depo. 15:9- 16:19, he does not know what the corporate policy is and relies on the advice of HCMP.  Plaintiff contends that Mr. Morgan's testimony provides evidence of FedEx's alleged corporate policy.  Specifically Mr. Morgan testified that he has never encountered, in 15 years working at FedEx, couriers with physical limitations or disabilities who were accommodated so they could do the job of a courier.  *See* Morgan Depo. 20:1-8.

Defendant also states that although Mr. Slagle, Plaintiff's

48

manager, testified that FedEx does not accommodate employees-

when provided with clarification, he made it clear that he was

referring to non-disabled employees who want accommodations for

the sake of convenience:

> Q: Okay.  And when you said you don't make
> accommodations for the employees, is this something you
> have been – you have learned of through the policies of
> FedEx or how do you know that?  Is that just through
> the practices you have observed over the years or
> something you were instructed by your superiors?
> A. We were instructed basically not to make
> accommodations, right.
> ---
> Q.  Just for clarification, are you speaking about
> employees with not – who are not disabled or disabled
> employees?
> A. Yes.  Just an employee that was to have an
> accommodation, i.e., I need to have a route near my
> home so I can go home at lunch to let my kids in.
> Q. Okay.  I was referring to employees with physical
> limitations due to an injury or a medical disability or
> handicap, someone with a physical disability.
> A. Okay.
> Q. Okay.  Do you make reasonable accommodations for
> these drivers?
> A.  That would all be handled through HCMP.
> Q. Okay.  But do you know what the policy is in that
> regard?
> A. I don't.

Slagle Depo, 41:3-10, 41:19-25 - 42:1-12.

Mr. Slagle also stated:

> Q. All right.  And I will represent – and the
> deposition speaks for itself, but in Harry Saurer's
> deposition – we have already taken his deposition, and
> he said it's the policy of FedEx not to make
> accommodations – not to allow drivers to make their own
> accommodations who have physical limitations.
> A. Right.

49

Q. Okay.  Have you heard of that before?
A. Yes
Q. Okay. From whom at FedEx?
A. Just in management training.

Slagle Depo. 42:2-23.

Q. Do you have an understanding that employees of
Federal Express with physical restrictions can request
a reasonable accommodation through HCMP?
A. Yes.

Slagle Depo. 64:11-14.

Plaintiff argues Mr. Saurer, FedEx's Human Capital Program

Manager, testified at his deposition that in the courier

position it is rare for accommodations to be made for someone

who has a physical limitation or any restrictions due to the

physical nature of the job.  He gave one example of

accommodations made for physical disability.  If a courier does

not pass a vision test, but maintains an operator's license, he

or she can be accommodated with an Econoline van for driving, if

one is available.  Beyond that he was not aware of any

accommodations.  *See* Saurer Depo. 27:5 - 28:16.  He further

stated:

A. What I am telling you is, if you are given
restrictions and limitations, medical restrictions and
limitations that are contrary to the physical
requirements of the courier position, then you are
precluded from doing that job.
Q. According to Federal Express Policy?
A. That's correct.

Saurer Depo. 30:21-31.

50

Plaintiff claims that FedEx does not allow its employees to perform the essential functions of the courier position through self-modification and cites the testimony of Mr. Saurer:

> Q: Well, what if there is a physical disability — what if someone has a physical disability that doesn't meet the criteria or that precludes them under the written criteria from doing the job, but they are able to do the job anyway through their own self-imposed accommodations? Will Federal Express accommodate that person and allow them to do their job?
> A. Once the accepted medical opinion states that, the person has physical limitations and restrictions that preclude them from being able to safely perform the job, then self-modification is not an option.

Saurer Depo. 28:17-29:2. Mr. Saurer testified later that he understood that the law requires employers to make reasonable accommodations for a person's physical limitations. Saurer Depo. 69:20-23.

If a jury believes Mr. Morgan's testimony that FedEx does not accommodate employees with disabilities and there has never been an accommodation in 15 years, a question of reckless or conscious disregard of known rights is raised. Defendant's motion for summary judgment regarding Plaintiff's punitive damages claim is DENIED.

B.   At-Will Employment (Second Cause of Action)

Defendant FedEx moves for summary on Plaintiff's second cause of action alleging breach of the employment contract between Plaintiff and FedEx because Plaintiff was allegedly

terminated without just cause.   Defendant asserts the employment

agreement between FedEx and Plaintiff is "at-will" and therefore

no cause need be given for termination of Plaintiff.

An "at-will" employment may be ended by either party at any

time without cause, for any or no reason, and subject to no

procedure except the statutory requirement of notice.   *Guz v.*

*Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 335, 100 Cal.Rptr.2d 352

(2000).   California Labor Code Section 2922 provides:

> An employment, having no specified term, may be
> terminated at the will of either party on notice
> to the other. Employment for a specified term
> means an employment for a period greater than one
> month.

Cal. Lab. Code § 2922.   Section 2922 establishes a strong

presumption in favor of at-will employment, with several

limitations.   *Guz*, 24 Cal.4th at 335-36.   The presumption can be

overcome by evidence of an agreement between employer and

employee limiting the employer's termination rights.   *Id.*

"Thus, though Labor Code section 2922 prevails where the

employer and employee have reached no other understanding, it

does not overcome their 'fundamental ... freedom of contract' to

depart from at-will employment."   *Id.* at 336.   The understanding

need not be express, but may be implied in fact, arising from

the parties' conduct evidencing their intent to alter at-will

employment status.   Such agreements, if otherwise lawful, are

52

enforceable. *Id.*

The totality of the circumstances must be examined to determine whether the parties' conduct created an implied-in-fact contract limiting the employer's termination rights. Relevant factors include: (1) the personnel policies or practices of the employer; (2) the employee's length of service; (3) actions or communications by the employer reflecting assurances of continued employment; (4) the practices of the industry in which the employee is engaged. *Guz*, 24 Cal.4th at 336-37, *citing Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680, 765 P.2d 373 (1988). The *actual understanding* of the parties regarding the precise terms of the employment relationship must be enforced. *Id.* at 337 (emphasis added).

Every case turns on its own facts. If such evidence logically permits conflicting inferences, a question of fact is presented. But where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper. *Id.*

Here, there are disputed issues of material fact precluding a definitive finding that the parties had an "at-will" employment agreement when Plaintiff's employment ended. Specifically, a FedEx letter of January 7, 2003, written by Mr. Slagle to Plaintiff, raises a material issue of fact on whether

FedEx agreed to hold Plaintiff's position for 90 days, after they placed her on medical leave in December 2002, thereby altering the employment "at-will" agreement for this limited purpose.  ROSUF #90  Plaintiff alleges: "on January 7, 2003, Defendant, in a letter drafted by Mr. Slagle, promised Plaintiff her position would be held open for 90 days."  Doc. 30, Opposition, 19.  Defendant claims the letter was never sent and the letter's offer to hold open Plaintiff's position for 90 days was conditioned upon Plaintiff having a temporary condition which Defendant contends Plaintiff had a permanent condition based on specialist's Dr. Branscum's medical report.[7]  Plaintiff argues that FedEx in direct breach of its promise in the letter, placed Plaintiff's route up for bid on January 7, 2003 and her route was awarded.  PSUF ##76-77.  Plaintiff contends because her medical condition was temporary she was to be afforded the 90 days to return to her job.  PSUF ##73, 78.  Plaintiff informed Mr. Slagle that she would return to her courier job shortly after she was removed from her position.  PSUF #79.

Defendant argues Plaintiff Riordan never received the letter as she never signed and mailed the letter in spite of the

---

[7] Mr. Slagle states in his declaration that after discussing with Mr. Saurer the fact that Ms. Riordan's restrictions were permanent, not temporary, he never mailed the letter.  Slagle Decl., ¶ 5.

language in the letter directing her to "Please acknowledge receipt of this information by signing below and returning ... to Harry Saurer in the self-address prepaid envelope."  ROSUF #91  Plaintiff rebuts that she testified that she remembers seeing the first part of the letter but not the portion regarding "employee benefits."  ROSUF #92 (Pl.'s Resp: "Plaintiff testified that she remembered seeing the first part but did not remember seeing the part about 'employee benefits'.")  Plaintiff alleges this promise, unlike that made to her by Mr. Saurer in his January 7, 2003, letter, was not conditioned on Plaintiff selecting a reassignment.  It is undisputed Don Slagle signed a letter to Plaintiff on January 7, 2003, that described the terms of the medical leave that employees receive, and page two of the letter stated that a position would be held open for Plaintiff for 90 days.  ROSUF #89.  The letter states: "Based on the medical documentation you submitted to me on December 30, 2002, you will be unable to return to work until April 1, 2003."  Doc. 16-6, Slagle Decl., Exhibit A, FEX(MR) 00581.

Plaintiff's Route One was put up for bid on January 7, 2003.  ROSUF #93  (Pl.'s Resp: "Admit that Plaintiff's route was put up for bid on January 7, 2003").  Plaintiff alleges that her Route One courier position should not have been put up for bid

and awarded to another courier based on the promise in the letter stating FedEx would hold the position for 90 days.

Defendant asserts that a January 7, 2003 letter from Mr. Saurer is the letter that governs.  On January 7, 2003, Mr. Saurer sent Plaintiff a letter which explained Plaintiff's medical leave would last for 90 days and if by the end of her leave Plaintiff did not accept a position in which she could perform all of the essential functions, her employment with FedEx would be terminated.  ROSUF #87.  The January 7, 2003 letter from Mr. Saurer directed Plaintiff to "Please acknowledge receipt of this information by signing below and returning in the self-addressed envelope."  ROSUF #88.  Plaintiff complied with that request and signed the letter.  *Id.*

Plaintiff also alleges that a contract for good-cause employment was implied from the fact Plaintiff was a twenty-year employee who performed her job duties competently and was rarely if ever disciplined.  Doc. 30, Opposition, 20; *see also* Doc. 1, Complaint, ¶ 22 ("[t]he express and implied terms not to be terminated except for good cause[] arose from [P]laintiff's longevity of service, her promotions and praise for her work by [D]efendant, her pay raises and awards").  A plaintiff's successful longevity as a FedEx employee usually does not overcome the presumption in favor of at-will employment.  Cal.

56

Lab. Code § 2922; *Guz*, 24 Cal.4th at 341-42.

Plaintiff asserts that no one in management at FedEx ever told her she could not be terminated without a good reason. ROSUF #12.  Plaintiff testified she did not read anywhere she could not be terminated without a good reason.  ROSUF #13. Plaintiff claims that statements made by Defendant's managers in their deposition indicate it was FedEx's policy and practice to terminate its employees only for good cause.  *See* Morgan Depo. 40:20-25 (Q: Is it the policy and practice of FedEx to terminate employees only for good cause?  A: Correct.  I mean yeah.  Q: What is your answer?  A: Yes.); Slagle Depo. 56:17-20 (Q: Okay. Have you ever known an employee that has ever been terminated without good cause?  A: No.)

It is the actual understanding of the parties regarding the precise terms of the employment relationship that must be enforced.  *Guz*, 24 Cal.4th at 337 (emphasis added), *citing Foley*, 47 Cal.3d 654, 677.  Testimony alone from FedEx's managers will not sufficient to demonstrate that Plaintiff's employment agreement was strictly "at-will."  Testimony by a president in *Guz* that the company only terminated workers for "good reason" was not sufficient for an employee to rely on:

> As the sole evidence of this policy, Guz points to
> the deposition testimony of Johnston, BNI's
> president, who stated his understanding that

> Bechtel terminated workers only with "good reason"
> or for "lack of [available] work."

*Id.* at 345.   The employees in *Guz* were not aware of such
testimony and the Court considered a brief and vague statement
by a single company official that the company sought to avoid
arbitrary findings insufficient as a matter of law to permit the
plaintiff to reasonably rely on that the company "had contracted
away its rights to discharge" the plaintiff at-will.   *Id.*

Defendant cites as evidence of an "at-will" employment
agreement the Employment Application and Agreement, People
Manual and the Employment Handbook.   The employment application
states "such employment shall be for an indefinite period and
may be terminated at any time without notice or liability for
wages or salary . . ."   The People Manual and Employment
Handbook is also offered to support this conclusion.
Plaintiff's Record of Receipt signed on May 18, 1994 for the
People Manual stated, in pertinent part:

> [FedEx] wants you to understand that *The Federal
> Express Employee Handbook* <u>should not be considered
> a contract of employment</u>, ... <u>Your specific rights</u>
> as an employee are <u>governed by the Employment
> Agreement</u> you signed in your employment
> application.

ROSUF #7.   The verification of the Record of Receipt also stated
that the only company representative that can enter into an
agreement of employment for any "specified period of time" is

the CEO or a designated vice president:

> I understand [] *The Federal Express Employee
> Handbook* contains guidelines only . . . I further
> understand [] <u>no manager or representative of the
> Company, other than the CEO or a senior vice
> president designated by the CEO, has any authority
> to enter into any agreement</u> modifying this
> publication in any way, or <u>to enter into an
> agreement of employment with me for any specified
> period of time</u>. Any amendment or agreement, if
> made, <u>shall not be enforceable unless it is in
> writing and signed by me and the CEO or designated
> senior vice president</u>.

ROSUF #8. Plaintiff signed Record of Receipts regarding the same on October 17, 1996, and March 22, 2002, containing language virtually identical to the language contained in the May 18, 1994 Record of Receipt. Both Records of Receipt also contained identical verifications as the one signed in 1994. ROSUF #10. Further, the "Purpose" section of the People Manual stated that the manual was not an employment contract nor may a contract be implied from it. ROSUF #11.

*Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal.App.4th 1359, 88 Cal.Rptr.2d 802 (1999), held employee's signatures on employment application and employee handbook, each of which stated employer's policy of at-will employment, provide "strong evidence" of at-will employment status, even though neither document was an integrated contract. 74 Cal.App.4th at 1388.

Here, Plaintiff's signatures on the employment application

and the successive editions of the People Manual, each of which set forth employer's policy of at-will employment, provide strong evidence of the parties' mutual understanding that Plaintiff's employment status was at will.  While disclaimer language in an employee handbook or policy manual does not necessarily mean an employee is employed at will, such a provision should not be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create binding limits on an employer's statutory right to terminate the relationship at will.  Like any direct expression of employer intent, communicated to employees and intended to apply to them, such language must be taken into account, along with all other pertinent evidence, in ascertaining the terms on which a worker was employed.  *Guz*, 24 Cal.4th at 340.[8]

Based on the evidence presented by the parties, there are material issues of genuine fact as to whether under the totality of the circumstances, the parties entered into an "at-will"

---

[8] Plaintiff also alleges FedEx has a policy called "People, Service, Profit[,]" which states people come first, service comes second, and profit comes last.  FedEx's alleged policy called "People, Service, Profit[,]" which states people come first, service comes second, and profit comes last, cannot reasonably be read as guaranteeing termination only for good cause.  This policy statement does not address at-will or good-cause employment termination status in any way, and does not limit Defendant's discretion to terminate Plaintiff's employment.

employment.   While the facts predominately point to an at-will employment agreement between Plaintiff and Defendant FedEx, the January 7, 2003 letter creates a genuine issue of material fact as to whether, in this limited instance, the employment agreement was altered slightly to provide a 90-day period of employment for Plaintiff after she was placed on disability. Plaintiff's second cause of action for breach of employment agreement marginally survives the summary judgment challenge brought by Defendant FedEx.

Defendant's motion for summary judgment regarding Plaintiff's second cause of action for breach of employment agreement is DENIED.

C.   Covenant of Good Faith and Fair Dealing

Plaintiff's third claim is dismissed with prejudice. Plaintiff's third claim alleges Defendant's termination of Plaintiff's employment violated the covenant of good faith and fair dealing, in that a "special employment relationship" existed between Plaintiff and Defendant, Doc. 1, Complaint, ¶ 29.   Plaintiff alleges the termination was done in bad faith — without good faith belief that there was good cause for termination, *id.*, ¶ 30 — and the termination was "extraneous to the employment contract with the intent to frustrate [P]laintiff's employment and her contract rights," *Id.*, ¶ 30.

61

Plaintiff alleges Defendant breached the covenant in treating Plaintiff differently from other similarly situated employees, exhibiting bad faith in singling Plaintiff out for adverse employment action. *Id.*, ¶ 31. Plaintiff's second claim for breach of employment agreement claim covers any issues concerning the employment relationship between Plaintiff and her employer Defendant FedEx. Plaintiff did not provide any evidence to support this claim in his Opposition nor address this claim and agreed to its dismissal with prejudice at oral argument.

Plaintiff's third cause of action is DISMISSED WITH PREJUDICE.

## VI.  CONCLUSION

For the foregoing reasons,

(1)  Defendant's motion for summary judgment on Plaintiff's FEHA employment discrimination claim is DENIED.

(2)  Defendant's motion for summary judgment on Plaintiff's FEHA failure to provide reasonable accommodation claim is DENIED.

(3)  Defendant's motion for summary judgment on the punitive damages remedy sought under Plaintiff's FEHA claims is DENIED.

(4)  Defendant's motion for summary judgment on Plaintiff's

**second cause of action for breach of employment agreement is DENIED.**

**(5)   Plaintiff's third cause of action for violation of the covenant of good faith and fair dealing is DISMISSED WITH PREJUDICE.**

IT IS SO ORDERED.

**Dated:   August 4, 2008          /s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE